Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| **JOSÉ A. MERCADO TORRES** | | ***APELACIÓN*** |
|---|---|---|
| Parte apelante | | Procedente del Tribunal de Primera Instancia, Sala Superior de **BAYAMON** |
| v. | TA2025AP00637 | |
| **BIELLA, LLC** | | Caso Núm.: BY2025CV04764 |
| Parte apelada | | Sobre: SENTENCIA DECLARATORIA |

Panel integrado por su presidente el Juez Sánchez Ramos, la Jueza Romero García y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 19 de diciembre de 2025.

Comparece la parte apelante, José A. Mercado Torres, en adelante, Mercado Torres o apelante, mediante recurso de "*Apelación*", y nos solicita la revocación de la "*Sentencia*" notificada por el Tribunal de Primera Instancia, Sala Superior de Bayamón, en adelante TPI-Bayamón, el 7 de noviembre de 2025. En la sentencia apelada, el foro recurrido desestimó la demanda presentada por el apelante.

Por los fundamentos que expondremos a continuación, *confirmamos el dictamen apelado.*

### I.

El 10 de septiembre de 2025, Mercado Torres presentó una "*Demanda*" contra Biella LLC, en adelante Biella o apelada.[1] Según surge de la referida demanda, los hechos que emprenden la controversia que hoy nos ocupa se remontan al 26 de marzo de 2024, cuando Mercado Torres suscribió con Biella, un Contrato Uniforme de Compraventa, para la adquisición de la Unidad 23 del

---

[1] Entrada 1 de SUMAC.

Proyecto Residencial Sereno by Hage en Guaynabo, Puerto Rico.[2] Mercado Torres alegó que dicho contrato fue redactado íntegramente por Biella mediante un formulario de cláusulas generales predispuestas[3], propio de un contrato de adhesión. Según expuso en la demanda, el contrato establecía que el precio de la unidad ($2,099,000.00) se pagaría mediante depósitos escalonados de doscientos mil dólares ($200,000.00).

Mercado Torres afirmó haber cumplido cabalmente con el primer pago. No obstante, sostuvo que, al intentar realizar el segundo deposito, se vio impedido de cumplir debido a las actuaciones de Biella. El apelante alegó que estuvo dispuesto a efectuar el segundo pago pero que Biella, a través de alegados cambios unilaterales, comunicaciones contradictorias y rechazo injustificado del pago, frustró su cumplimiento y posteriormente procedió a cancelar el contrato imputándole un incumplimiento que, según sostiene, no le era atribuible.

En virtud de lo expuesto, Mercado Torres solicitó al foro primario que dictara una sentencia declaratoria, admitiera la consignación de cien mil dólares ($100,000.00) en pago de lo adeudado y concediera un remedio provisional que impidiera la enajenación del inmueble.[4]

El 7 de octubre de 2025, Biella presentó una *"Moción de Sentencia Sumaria",* en la cual propuso los siguientes hechos incontrovertibles:

1. El Departamento de Asuntos del Consumidor le expidió a Biella LLC licencia de urbanizador número SJ-18811-URB de conformidad a la Ley 130 de 13 de junio de 1967.[5]
2. El 29 de febrero de 2024, el DACO aprobó el modelo del Contrato Uniforme de Compraventa a utilizarse en el proyecto Sereno concluyendo que "cumple con los requisitos de la Ley Núm. 130 del 13 de junio de 1967, según enmendada, y del 'Reglamento de Construcción'

---

[2] Entrada 13 de SUMAC, Anejo 3.
[3] *Íd.*, Anejo 2.
[4] Entrada 1 de SUMAC.
[5] Entrada 13 de SUMAC, Anejo 1.

promulgado a su amparo y es el único contrato autorizado y aprobado para ser utilizado.[6]

3. Mediante Contrato Uniforme de Compraventa fechado 26 de marzo de 2024, el Sr. José A. Mercado Torres se obligó a comprar y Biella se obligó a vender, la unidad número 23 de la Urbanización Sereno (la "Unidad de Vivienda"); sujeto a las cláusulas y condiciones que allí se estipulan (el "Contrato Uniforme").[7]

4. En el Contrato Uniforme el Sr. Mercado indicó que su correo electrónico es jlmercado3070@yahoo.com y su dirección postal para notificaciones es PO Box 3000, Guaynabo PR 00970-3000.[8]

5. En el Contrato Uniforme el Sr. Mercado se comprometió a dar un segundo depósito de $100,000.00 en o antes del 15 de enero de 2025 (en adelante el "Segundo Pago").[9]

6. El Contrato Uniforme de Compraventa dispone en lo pertinente que:

> "31. Mediante debida notificación escrita remitida al comprador por correo o personalmente la vendedora podrá resolver este contrato en cualquiera de los siguientes casos:... (a) Cuando el COMPRADOR no pague el Depósito aquí requerido dentro del (de los) término(s) o en la(s) fecha(s) pactadas. ... (e) Por cualquiera de las otras causas especificadas en este contrato que le permitan a la vendedora cancelarlo por algún acto u omisión atribuible al comprador o por incumplimiento a las condiciones paternales de este contrato. ... (g) Si el COMPRADOR no cumple a tiempo con cualquiera de sus obligaciones o responsabilidades bajo este Contrato."[10]

7. Sobre la penalidad aplicable, en la eventualidad que el Comprador incumpla el Contrato, provee éste que:

> "32. ... En caso de que este Contrato se resuelva o de por terminado por alguna de las causas indicadas en los incisos (a), (b), (c), (e), (f) o (g) de su Sección 31, ... la VENDEDORA, retendrá para sí aquella parte del Depósito adelantado por el COMPRADOR que permite este Contrato [1] sin la necesidad de probar daños."[11]

8. Sobre las notificaciones entre las partes dispone la cláusula 36 del Contrato Uniforme que:

> "Las notificaciones entre las partes relacionadas con este Contrato, para las cuales no se haya provisto de otra forma en alguna de sus cláusulas, se harán por correo certificado o personalmente, con acuse de recibo y con no menos de diez (10) días calendarios de antelación, o por correo electrónico y con no menos de cinco (5) días calendarios de antelación, a las respectivas direcciones de las partes que se consignan al final de este Contrato. La COMPRADORA reconoce que es esencial el mantener comunicación con la parte VENDEDORA por lo que se compromete a ser diligente y a aceptar y recoger las notificaciones que le pueda enviar la VENDEDORA por correo certificado y a acusar recibo de estas. Se

---

[6] Entrada 13 de SUMAC, Anejo 2.

[7] *Íd.*, Anejo 3, págs. 1 y 15.

[8] *Íd.*, Anejo 4 y Anejo 3, pág. 14.

[9] *Íd.*, Anejo 3, pág. 7.

[10] *Íd.*, pág. 11-12.

[11] *Íd.*, pág. 12.

advierte que el no buscar o recibir las comunicaciones de la Vendedora se considerará como un incumplimiento material de este Contrato por lo que el VENDEDOR quedará facultado a dar por terminado el mismo conforme a la cláusula 31(g). Independientemente de lo que se disponga en contrario en este Contrato, en la eventualidad que en cualquier parte de este Contrato requiera notificación por correo certificado o personalmente, se entenderá que una parte ha renunciado a su derecho a ser notificado mediante dichos métodos si acusa recibo de una comunicación, contesta la comunicación, reconoce haber recibido la misma y/o se hace constar recibo mediante un recibo electrónico de "recibido" o de "leído" ("delivery receipt" o "read receipt")."[12]

9. Sobre las modificaciones al Contrato Uniforme este dispone en su clausula 34 que: "Ni este Contrato, ni cualquier parte, término o condición del mismo, podrá ser modificado, excepto mediante un acuerdo escrito que sea firmado por todos los aquí comparecientes y sometido al DACO."[13]

10. Llegado el 15 de enero de 2025, el demandante no realizó el Segundo Pago, conforme a lo que acordó el Contrato.[14]

11. El 16 de junio de 2025, Biella LLC le remitió al Sr. Mercado, por correo electrónico y correo certificado con acuse de recibo, una primera comunicación recordándole que no ha realizado el Segundo Pago y solicitando que se comunique con las oficinas de Biella para realizar éste. El demandante recibió la comunicación por correo certificado el 23 de junio de 2025.[15]

12. El demandante le hizo caso omiso a la comunicación de 16 de junio de 2025.[16]

13. El 11 de julio de 2025, Biella le remitió al demandante una segunda comunicación requiriendo el Segundo Pago. Esta vez Biella le remitió al demandante un correo electrónico donde le concedió un término de 15 días para realizar el Segundo Pago. A dicha comunicación Biella le adjunto copia de la carta de 16 de junio de 2025.[17]

14. El demandante tampoco se comunicó con Biella, ni realizó el Segundo Pago en el plazo concedido en la comunicación de 11 de julio de 2025.[18]

15. El 5 de agosto de 2025, Biella le remitió al Sr. Mercado una tercera comunicación sobre el Segundo Pago. Mediante correo electrónico Biella le concedió 5 días para pasar por la oficina de Biella para realizar el Segundo Pago. El sistema electrónico confirmó que la entrega de dicha comunicación se completó el 5 de agosto de 2025.[19]

16. El Sr. Mercado no se comunicó con el personal de Biella ni realizó el Segundo Pago en torno a la comunicación de 5 de agosto de 2025.[20]

---

[12] Entrada 13 de SUMAC, Anejo 3, pág. 13.
[13] *Íd.*, pág. 12.
[14] *Íd.*, Anejo 13.
[15] *Íd.*, Anejo 4.
[16] *Íd.*, Anejo 13.
[17] *Íd.*, Anejo 5.
[18] *Íd.*, Anejo 13.
[19] *Íd.*, Anejo 6.
[20] *Íd.*, Anejo 13.

17. El 12 de agosto de 2025, el Sr. Alejandro Brito (principal ejecutivo de Biella) le remitió un mensaje de texto al Sr. Mercado (imessage) donde por cuarta vez le solicitó que realice el Segundo Pago. El Sr. Mercado contestó que, alegadamente, no había recibido comunicación alguna de parte del personal de Biella, que estaba de viaje y que al día siguiente verificaba si todo estaba bien en el banco y llamaba para coordinar venir a la oficina.[21]

18. Ante la alegación del Sr. Mercado de que no había recibido comunicación alguna y como quinto recordatorio, el 13 de agosto de 2025, el Sr. Brito le remitió al Sr. Mercado, por mensaje de texto, copia de la comunicación de 16 de junio de 2025 con el acuse de recibo firmado por el demandante.[22]

19. El 13 de agosto de 2025, el Sr. Mercado tampoco se comunicó con el personal de Biella para realizar el Segundo Pago según indicó que haría.[23]

20. El 20 de agosto de 2025, la representación legal de Biella LLC le remitió al Sr. Mercado una comunicación, por correo certificado con acuse de recibo y correo electrónico, informándole que Biella había ejercido su derecho a dar por resuelto el Contrato Uniforme (la "Carta de Terminación").[24]

21. Conforme a lo que indicó el sistema automatizado, la entrega del correo electrónico con la Carta de Terminación fue completada el 20 de agosto de 2025 a las 9:36 am.[25]

22. El Sr. Mercado nunca recogió el correo certificado con la Carta de Terminación, a pesar de que estuvo disponible desde el 23 de agosto de 2025.[26]

23. A partir del 22 de agosto de 2025, ya terminada la relación contractual, el Sr. Mercado trató de comunicarse con el Sr. Brito.[27]

24. El 27 de agosto de 2025, el Sr. Mercado se personó a las oficinas de Biella para alegadamente realizar el Segundo Pago.[28]

25. El 27 de agosto de 2025, al Sr. Mercado recibió personalmente copia de la Carta de Terminación.[29]

26. En su visita a las oficinas de Biella el 27 de agosto de 2025, el Sr. Mercado intentó entregar un cheque que no tenía fondos pues, alegadamente, tenía un problema con su banco localizado en la ciudad de Miami.[30]

27. Biella, rehusó recibir el cheque debido a que el contrato ya se había terminado y que el cheque no tenía fondos.[31]

28. El 27 de agosto de 2025, mediante comunicación a puño y letra, el demandante reconoció que el cheque que intentó entregar no tenía fondos (por lo que se trasladaría a la ciudad de Miami para gestionarlos), pero solicitó la reconsideración de la terminación del contrato.[32]

---

[21] Entrada 13 de SUMAC, Anejo 7.
[22] *Íd.*, Anejo 13.
[23] *Íd.*
[24] *Íd.*, Anejo 8 y 13.
[25] *Íd.*, Anejo 8.
[26] *Íd.*
[27] *Íd.*, Anejo 7 y 13.
[28] *Íd.*, Anejo 9 y 13.
[29] *Íd.*
[30] *Íd.,* Anejo 9.
[31] *Íd.,* Anejo 13.
[32] *Íd.,* Anejo 9.

29. Mediante comunicación de 29 de agosto de 2025, Biella, por conducto de su representación legal, se sostuvo en la terminación de contrato previamente hecha. Dicha comunicación fue remitida por correo electrónico y por correo certificado. No obstante, el demandante nunca recogió el correo certificado.[33]

30. Mediante comunicación de 4 de septiembre de 2025, el demandante, por conducto de su representación legal, remitió un cheque por la cantidad del Segundo Pago.[34]

31. Mediante comunicación de 9 de septiembre de 2025 la representación legal de Biella devolvió el cheque al demandante.[35]

Para sustentar los hechos alegadamente incontrovertibles, Biella adjuntó como prueba los siguientes documentos:

1. Licencia de Urbanizador[36]

2. Carta de aprobación de Contrato DACo[37]

3. Contrato Uniforme[38]

4. Carta de Recordatorio de 16 de julio de 2025[39]

5. Correo electrónico de 11 de julio de 2025[40]

6. Correo electrónico de 5 de agosto de 2025[41]

7. Mensajes de texto[42]

8. Carta de terminación[43]

9. Solicitud de reconsideración de 27 de agosto de 2025[44]

10. Denegatoria de reconsideración[45]

11. Carta de Lcdo. Rolón de 4 de septiembre de 2025[46]

12. Carta de 9 de septiembre de 2025 en respuesta al Lcdo. Rolón[47]

13. Declaración Jurada Alejandro Brito[48]

Por su parte, el apelante presentó su oposición a la solicitud de sentencia sumaria el 13 de octubre de 2024.[49] En su escrito, Mercado Torres planteó que subsistían controversias materiales de hecho, entre ellas:

---

[33] Entrada 13 de SUMAC, Anejo 10.
[34] *Íd.,* Anejo 11.
[35] *Íd.*, Anejo 12.
[36] *Íd.*, Anejo 1.
[37] *Íd.*, Anejo 2.
[38] *Íd.*, Anejo 3.
[39] *Íd.*, Anejo 4.
[40] *Íd.*, Anejo 5.
[41] *Íd.*, Anejo 6.
[42] *Íd.*, Anejo 7.
[43] *Íd.*, Anejo 8.
[44] *Íd.*, Anejo 9.
[45] *Íd.*, Anejo 10.
[46] *Íd.*, Anejo 11.
[47] *Íd.*, Anejo 12.
[48] *Íd.*, Anejo 13.
[49] Entrada 15 de SUMAC.

(a) si la parte demandada notificó válidamente la terminación conforme a las cláusulas contractuales y con acuse de recibo; (b) si el retraso en el segundo pago fue provocado por la propia conducta dilatoria y tolerante de la parte vendedora; (c) si el cheque ofrecido el 27 de agosto contaba con fondos y si su rechazo fue injustificado; (d) la interpretación de las cláusulas 30, 31 y 33 del contrato a la luz de los principios de buena fe contractual y la normativa aplicable del DACO; y (e) la credibilidad y el peso probatorio de las declaraciones juradas de la parte demandante, en conjunto con la prueba documental y testimonial que esta parte ofrecerá una vez se pueda acceder a la prueba conforme a Derecho. Estos asuntos requieren prueba adicional, incluyendo deposiciones y descubrimiento formal, indispensables para cumplir cabalmente con el marco procesal de la Regla 36 antes de considerar la entrada de una sentencia sumaria.[50]

Sin embargo, el apelante no anejó prueba adicional para sustentar sus alegaciones.

El 14 de octubre de 2025 Biella presentó su *"Contestación a la Demanda".*[51] En dicho escrito alegó que, desde el 20 de agosto de 2025 se le remitió a Mercado Torres, copia de la carta de cancelación del contrato tanto por correo electrónico como por correo certificado. Añadió que, el 27 de agosto de 2025, luego de que la apelada diera por terminada la relación contractual, Mercado Torres se personó en la oficina de Biella con la intención de efectuar el segundo pago mediante un cheque que alegadamente no tenía fondos. Sostuvo, además, que dicho cheque fue rechazado por conducto de su representación legal, dado que el contrato ya había sido resuelto y, por consiguiente, no subsistía obligación alguna pendiente de cumplimiento por parte de Biella.

El 6 de noviembre de 2025 el TPI-Bayamón emitió la *"Sentencia Final",* notificada el 7 de noviembre de 2025, mediante la cual desestimó la demanda presentada por Mercado Torres e impuso honorarios de abogado por la suma de dos mil quinientos dólares ($2,500.00). El foro primario concluyó que el apelante ignoró los hechos y el derecho aplicable al instar un reclamo que conocía o

---

[50] Entrada 15 de SUMAC.
[51] Entrada 17 de SUMAC.

debía conocer era improcedente, y enfatizó que este no produjo documento alguno que sustentara su reclamación.[52]

El 17 de noviembre de 2025, Mercado Torres presentó una *"Moción en Reconsideración a Sentencia"*[53], en la cual alegó que la sentencia sumaria fue dictada de forma prematura y contenía múltiples errores de hecho y de derecho que vulneraron su derecho al debido proceso de ley. Ese mismo día, el foro de instancia declaró *"No Ha Lugar"* dicha moción, determinación que fue notificada el 18 de noviembre de 2025.[54]

Inconforme con el proceder del Foro Primario, el 5 de diciembre de 2025, la apelante recurrió ante esta Curia mediante la presentación de una *"Moción en Auxilio de Jurisdicción"*, la cual fue declarada *"No Ha Lugar"* ese mismo día. Junto a dicha solicitud, Mercado Torres presentó el recurso de *"Apelación"*, en el cual se le imputa al TPI-Bayamón los siguientes señalamientos de error:

> **PRIMER ERROR**: Erró el Tribunal de Primera Instancia al adjudicar la controversia mediante sentencia sumaria sin respetar el propósito fundamental de las Reglas de Procedimiento Civil, particularmente aquellas que promueven alegaciones sencillas, un manejo ordenado del caso y el desarrollo natural del récord antes de resolver los méritos. Al acoger la moción de sentencia sumaria sin celebrar conferencia de manejo ni estructurar el caso conforme a la Regla 37, el TPI trastocó la secuencia procesal ordinaria y limitó indebidamente la capacidad del apelante para sustanciar sus reclamaciones.

> **SEGUNDO ERROR**: Erró el Tribunal de Primera Instancia al acoger la moción de sentencia sumaria presentada por la parte apelada sin permitir la culminación del descubrimiento de prueba indispensable para adjudicar las controversias materiales. Pese a que la oposición del apelante demostró que faltaba evidencia esencial —incluyendo notificación de terminación, correspondencia clave, manejo del segundo depósito, aplicación de los Reglamentos 2268 y 8070 del DACo y aumentos en los precios del proyecto—, el tribunal resolvió prematuramente, afectando su derecho a un desarrollo pleno del récord y al debido proceso de ley.

---

[52] Entrada 25 de SUMAC.
[53] Entrada 26 de SUMAC.
[54] Entrada 28 de SUMAC.

**TERCER ERROR**: Erró el Tribunal de Primera Instancia al validar la terminación contractual sostenida por la parte apelada sin evaluar ni aplicar los requisitos de los Reglamentos 2268 y 8070 del DACo sobre aprobación de contratos uniformes y notificación de terminación. Al presumir válida la notificación del 20 de agosto de 2025 sin acuse de recibo y sin tomar conocimiento judicial del contenido reglamentario exigido por la LPAUG, el TPI incurrió en error de hecho y de derecho y privó al apelante de las protecciones regulatorias diseñadas para evitar terminaciones defectuosas o arbitrarias.

**CUARTO ERROR**: Erró el Tribunal de Primera Instancia al descartar la naturaleza de adhesión del contrato uniforme de compraventa bajo el argumento de que, por ser un contrato "normado" por DACo, no podía ser a la vez de adhesión esa conclusión ignora que el contrato fue redactado íntegramente por la parte apelada sin espacio real de negociación para el apelante y que las discrepancias entre la cláusula 31, las cláusulas 30 y 33 y los Reglamentos 2268 y 8070 del DACo revelan una oscuridad contractual que no pudo ser evaluada adecuadamente sin descubrimiento de prueba.

**QUINTO ERROR**: Erró el Tribunal de Primera Instancia al rechazar de plano los recursos posteriores a la sentencia presentados por el apelante y negarse a considerar la evidencia nueva y pertinente, particularmente la ausencia de acuse de recibo en la carta de terminación, la conducta tolerante de la apelada y los aumentos posteriores en los precios del proyecto. Al denegar la reconsideración el mismo día de su presentación y sin análisis sustantivo, el TPI impidió completar el récord y limitó el derecho del apelante a un examen pleno de las controversias materiales.

**SEXTO ERROR**: Erró el Tribunal de Primera Instancia al imponer temeridad, costas y honorarios de abogado contra el apelante sin identificar qué alegaciones eran presuntamente falsas o frívolas ni fundamentar la supuesta conducta temeraria en hechos concretos del récord. Al sancionar una controversia sustantiva legítima sobre terminación contractual, cumplimiento del segundo pago y aplicación de los Reglamentos 2268 y 8070, el TPI incurrió en error de derecho y colocó al apelante en estado de indefensión procesal.

(Mayúsculas omitidas, énfasis nuestro).

Luego de examinar el recurso, y con el propósito de promover un despacho justo y eficiente más justo y eficiente, conforme a la Regla 7B(5) del Reglamento del Tribunal de Apelaciones, 4 LPRA

Ap. XXII-B, disponemos de este recurso sin el escrito de oposición de la parte recurrida.[55]

## II.

### A. Apelación Civil

Las Reglas de Procedimiento Civil se desenvuelven en un orden lógico, natural y armonioso entre sí. Este orden queda demostrado en las distintas etapas de un litigio (alegaciones, mociones, descubrimiento de prueba, vistas evidenciarias, sentencia, reconsideración, *apelación*) y sus efectos escalonados. Cada etapa se sirve de la anterior y se proyecta, entonces, para la próxima. *Vega v. Alicea*, 145 DPR 236, 238 (1998).

La *apelación* no es un recurso discrecional como en los casos de certiorari. Una vez se cumpla con los requisitos jurisdiccionales y de perfeccionamiento del recurso, el Tribunal de Apelaciones viene obligado a atender el asunto y resolverlo en sus méritos, de forma fundamentada. *Soc. de Gananciales v. García Robles*, 142 DPR 241, 252 (1997). En ese sentido, reconocemos que existe el derecho estatutario para acudir en apelación ante el Tribunal de Apelaciones cuestionando toda sentencia final emitida por el Tribunal de Primera Instancia. *Silva Barreto v. Tejada Martell*, 199 DPR 311, 317 (2017).

Es harto conocido que, al revisar una determinación de un foro de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Como regla general, los foros apelativos no tenemos facultad para sustituir las determinaciones de hechos del tribunal de instancia con nuestras propias apreciaciones. *Íd.*, pág.

---

[55] Esta regla nos permite "prescindir de términos no jurisdiccionales, escritos, notificaciones o procedimientos específicos en cualquier caso ante [nuestra] consideración, con el propósito de lograr su más justo y eficiente despacho [...]". Reglamento del Tribunal de Apelaciones, supra.

771; *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). De manera que, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

Sin embargo, la norma de deferencia esbozada encuentra su excepción y cede cuando la parte promovente demuestra que hubo un craso abuso de discreción, prejuicio, error manifiesto o parcialidad. *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 710 (2012). Además, se requiere que nuestra intervención en esta etapa evite un perjuicio sustancial. *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023); *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).

Por *discreción* se entiende el "tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción". *García v. Asociación*, 165 DPR 311, 321 (2005), citando a *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990). No obstante, "el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad". *Íd.* A esos efectos, el Tribunal Supremo de Puerto Rico ha indicado cuáles son situaciones que constituyen un abuso de discreción, a saber:

[C]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los

mismos. *Ramírez v. Policía de P.R.*, 158 DPR 320, 340-341 (2002), citando a *Pueblo v. Ortega Santiago*, supra, págs. 211-212. Así, pues, la discreción no implica que los tribunales puedan actuar de una forma u otra en abstracción del resto del derecho. *Rivera et al. v. Arcos Dorados et al.*, supra.

### B. Sentencia Sumaria

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Coop. Seguros Múltiples y otros v. ELA y otros,* 2025 TSPR 78, 216 DPR ___ (2025); *Consejo Tit. v. Rocca Div. Corp. et als,* 2025 TPSR 6, 215 DPR ___ (2025); *BPPR v. Cable Media,* 2025 TSPR 1, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2023); *Birriel Colón v. Econo y otro*, 213 DPR 80, 90 (2023); *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *Oriental Bank v. Caballero García,* 212 DPR 671, 678 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601, 610 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales **no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita.** *BPPR v. Zorrilla Posada y otro,* 214 DPR 329, 337 (2024); *Cruz, López v. Casa Bella y otros*, supra, pág. 993; *Oriental Bank v. Caballero García,* supra, pág. 678; *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 980. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. Reglas 36.1 y 36.2 de Procedimiento Civil, supra.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204

DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 979; *Ramos Pérez v. Univisión*, 178 DPR 200, 214 (2010). Como se sabe, en aras de prevalecer en una reclamación, **la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción.** *Id.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. Regla 36.3 de Procedimiento Civil, supra; *Oriental Bank v. Caballero García,* supra, pág. 679; *Pérez Vargas v. Office Depot,* 203 DPR 687, 698 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o

negaciones consignadas en su alegación". *BPPR v. Cable Media,* supra; *BPPR v. Zorrilla Posada y otro,* supra; *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, **si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho.** *Id.* Es decir, el hecho de no oponer a un petitorio sumario no implica que este necesariamente proceda, sin embargo, si no se demuestra que existen controversias sustanciales sobre los hechos materiales, nada impide al foro sentenciador de dictar sentencia sumaria. *Ramos Pérez v. Univisión,* supra, pág. 215.

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra, pág. 44. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil, supra. *Id.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Id.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil, supra, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole,*

164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *E.L.A. v. Cole*, supra, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá, cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Soto y otros v. Sky Caterers,* supra; *Cruz, López v. Casa Bella y otros*, supra, pág. 993; *Acevedo y otros v. Depto. Hacienda y otros,* 212 DPR 335, 350 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, supra. Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens,* 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Id.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otros v. ELA y otros*, 211 DPR 455, 471-472 (2023).

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el Foro Primario. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

*Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, "nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria". *Negrón Castro y otros v. Soler Bernardini y otros,* 2025 TSPR 96, 216 DPR ___ (2025), *Batista Valentín v. Sucn. Batista Valentín y otros,* 2025 TSPR 93, 216 DPR ___ (2025). *Coop. Seguros Múltiples y otros v. ELA y otros,* supra; *Consejo Tit. v. Rocca Div. Corp. et als,* supra; *Soto y otros v. Sky Caterers,* supra; *BPPR v. Cable Media, BPPR v. Zorrilla Posada y otro,* supra; *Cruz, López v. Casa Bella y otros,* supra, pág. 994. Por ello, nuestra revisión es una *de novo,* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, supra, y su jurisprudencia interpretativa. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar de *novo* si el foro primario aplicó correctamente el derecho.

### C. Contratos en General

En nuestra jurisdicción rige el principio de la autonomía contractual y *pacta sunt servanda.* Las partes pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarios a las leyes, la moral y al orden público. Artículo 1232 del Código Civil de 2020, 31 LPRA sec. 9753; *Batista Valentín v. Sucn. Batista Valentín y otros,* supra.

*Betancourt González v. Pastrana Santiago*, 200 DPR 169, 182 (2018). Los contratos tienen fuerza de ley entre las partes contrayentes, ante sus sucesores y ante terceros quienes vienen obligadas a observar sus términos en la forma que dispone la ley. Artículo 1233 del Código Civil de 2020, 31 LPRA sec. 9754; *MCS Advantage, Inc. v. Fossas Blanco*, 211 DPR 135, 166 (2023); *Feliciano v. Luxury Hotels International of Puerto Rico Inc.*, 210 DPR 712, 728 (2022).

Para que exista un contrato válido deben concurrir los elementos siguientes: el consentimiento de las partes sobre el objeto y la causa. Artículo 1237 del Código Civil de 2020, supra, sec. 9771; *Batista Valentín v. Sucn. Batista Valentín y otros*, supra; *Cruz, López v. Casa Bella y otros*, supra; *Pérez Rodríguez v. López Rodríguez et al.*, 210 DPR 163, 186 (2022); *Demeter Int'l v. Srio. Hacienda*, supra, pág. 727; *Negrón Vélez v. ACT*, 196 DPR 489, 505 (2016).

Estos requisitos se refieren a que el acuerdo sea consensual; que exista como objeto una polémica judicial o extrajudicial entre las partes que dé lugar a la transacción, y su causa que consiste en eliminar la controversia mediante las concesiones recíprocas. *Negrón Vélez v. ACT*, supra, pág. 505; *Neca Mortg. Corp. v. A&W Dev. S.E.*, 137 DPR 860, 870-871 (1995).

### D. Incumplimiento de Contrato

Nuestra jurisprudencia ha reiterado que los contratos se perfeccionan por el mero consentimiento y, desde ese momento, las partes quedan obligadas no solo al cumplimiento de lo expresamente pactado, sino también a todas aquellas consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. *Batista Valentín v. Sucn. Batista Valentín y otros,* supra; *Pérez Rodríguez v. López Rodríguez et al.*, supra, pág. 230; *Betancourt González v. Pastrana Santiago*, supra, pág. 182. En ese sentido, un contrato existe desde que una o varias personas

consienten en obligarse respecto de otra u otras a dar alguna cosa o a prestar algún servicio. *Pérez Rodríguez v. López Rodríguez et al.*, supra, pág. 230; *Demeter Int'l v. Srio. de Hacienda*, supra, págs. 726-727.

Asimismo, nuestro Tribunal Supremo ha reiterado que, en materia contractual, la ley primaria entre las partes es su voluntad. Por consiguiente, los tribunales no pueden relevar a una parte del cumplimiento de lo pactado cuando el acuerdo es legítimo y no adolece de vicio alguno. *Oriental Financial v. Nieves*, 172 DPR 462, 471 (2007); *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999).

Ahora bien, el Código Civil de Puerto Rico de 2020 dispone que cuando una de las partes incumple con su obligación de dar o de hacer, incurre en mora desde que el acreedor le exige, judicial o extrajudicialmente, el cumplimiento de la obligación. Art. 1159 del Código Civil de 2020, 31 LPRA sec. 9311. *No obstante, dicha exigencia no es necesaria cuando existe una fecha cierta para el cumplimiento de la obligación, en cuyo caso la mora se produce automáticamente al vencimiento del término pactado.* Art. 1160(b) del Código Civil de 2020, 31 LPRA sec. 9312.

Como consecuencia del incumplimiento contractual, nuestro ordenamiento jurídico reconoce a la parte perjudicada, como norma general, la facultad de optar entre exigir el cumplimiento específico de la obligación o *solicitar la resolución del contrato. Ramírez v. Club Cala de Palmas*, 123 DPR 339, 347 (1989). Además, tanto la normativa estatutaria como la jurisprudencia han establecido que la parte incumplida puede reclamar el resarcimiento de los daños y perjuicios sufridos como resultado del incumplimiento. *Id.*; Art. 1157 del Código Civil de 2020, 31 LPRA sec. 9303; véase, además, *800 Ponce de León v. AIG*, 205 DPR 163, 181 (2020).

### E. Contratos de adhesión y normas de interpretación

Conforme a nuestro ordenamiento jurídico, al interpretar un contrato, **cuando sus términos son claros y no dejan duda sobre la intención de las partes, debe prevalecer el sentido literal de sus palabras.** Art. 354 del Código Civil de Puerto Rico de 2020, 31 LPRA sec. 6342. Es decir, los términos de un contrato se reputan claros "cuando por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *S.L.G. Francis-Acevedo v. SIMED,* 176 DPR 372, 387 (2009). Solo cuando del texto contractual no pueda desprenderse con claridad la voluntad común de los contratantes, procede acudir a otros criterios interpretativos para determinar su intención. 31 LPRA sec. 6342

No obstante, el Código Civil reconoce expresamente la existencia de contratos celebrados mediante cláusulas no negociadas. En ese contexto, se consideran cláusulas generales aquellas contenidas en formularios predispuestos, diseñados y redactados unilateralmente por una de las partes. Art. 1247 del Código Civil de 2020, 31 LPRA sec. 9801. Dichas cláusulas deben ser asequibles y comprensibles para la parte que no las redacta y, como norma interpretativa, "el contrato con cláusulas generales se interpreta en sentido desfavorable a la persona que las redacta y en favor de la persona que tuvo menor poder de negociación". Íd.

En particular, el Código Civil define el contrato de adhesión como aquel en el cual la parte aceptante se ve precisada a consentir un contenido contractual predispuesto, sin una oportunidad real de negociación. Art. 1248 del Código Civil de 2020, 31 LPRA sec. 9802. En este tipo de contrato, sus cláusulas deben interpretarse en sentido desfavorable para quien las redactó y en favor de la parte

adherente. Íd.; *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 176–177 (2011).

A tono con lo anterior, el Artículo 1249 del Código Civil enumera una serie de cláusulas abusivas en los contratos de adhesión que pueden dar paso a la anulabilidad del contrato o de la cláusula afectada. Entre estas se incluyen, entre otras: **aquellas que no estén redactadas de manera clara y legible**; las que autoricen modificaciones unilaterales del contrato; las que limiten o restrinjan el acceso del adherente a los tribunales, los medios de prueba o inviertan la carga probatoria; las que excluyan o limiten la responsabilidad de la parte predisponente; las que alteren injustificadamente el domicilio contractual; las que prorroguen contratos por silencio del adherente; y aquellas que excluyan la jurisdicción de una agencia reglamentadora. 31 LPRA sec. 9803.

En la adjudicación de controversias relacionadas con contratos de adhesión, corresponde al tribunal examinar si el contrato contiene cláusulas ambiguas, oscuras o potencialmente abusivas. De existir ambigüedad, las disposiciones deben interpretarse en favor de la parte que no participó en su redacción. Sin embargo, en ausencia de ambigüedades o de diversas interpretaciones, los términos, condiciones y exclusiones claras y específicas deben hacerse valer conforme a la voluntad de las partes contratantes. *Jiménez López et. al. v. SIMED*, 180 DPR 1 (2010).

Asimismo, el tribunal conserva la facultad de evaluar la razonabilidad de las cláusulas predispuestas, a fin de garantizar un equilibrio contractual y evitar resultados inicuos. *Coop. Sabaneña v. Casiano Rivera*, supra, pág. 177; *Arthur Young & Co. v. Vega III*, 136 DPR 157, 166 (1994); *Serrano Picón v. Multinational Life Ins. Co.*, 212 DPR 981, 990–991 (2023).

### F. Reglamentos Núm. 2268 y 8070 del DACo

El Departamento de Asuntos del Consumidor (DACo) es la agencia administrativa encargada de proteger los intereses de los compradores de viviendas en Puerto Rico y de los consumidores en general. Esta agencia fue creada mediante la Ley Núm. 5 de 23 de abril de 1973, con el propósito primordial de vindicar e implementar los derechos del consumidor. 3 LPRA. sec. 341b. En el ámbito específico de la construcción y venta de viviendas, el DACo ejerce sus facultades al amparo de la Ley Núm. 130 de 13 de junio de 1967, según enmendada, conocida como la *Ley de la Oficina del Oficial de Construcción,* 17 LPRA secs. 501 et seq. (Ley 130), cuyo objetivo es reglamentar, en todas sus etapas, las actividades de los constructores y urbanizadores dedicados al negocio de la construcción de viviendas. *United Fed. Sav. v. D.A.C.O.,* 111 DPR 424, 427 (1981).

En virtud de los poderes conferidos por su ley orgánica y por la Ley 130, el DACo adoptó el *"Reglamento para regular las Distintas Actividades que se llevan a cabo en el Negocio de la Construcción de las Viviendas Privadas en Puerto Rico",* Reglamento Núm. 2268[56] de 17 de agosto de 1977. Posteriormente, dicho cuerpo normativo fue enmendado mediante el Reglamento Núm. 8070, el cual revisó y actualizó, entre otras disposiciones, las causas sustantivas y el procedimiento aplicable a la resolución de contratos de compraventa o de promesa de compraventa de vivienda nueva, así como el manejo de los depósitos efectuados por los compradores, con el fin de

---

[56] Ese marco reglamentario encuentra fundamento directo en el Artículo 10 de la Ley 130, 17 LPRA sec. 510, disposición en la cual el legislador estableció los requisitos mínimos que deben contener los contratos de opción, promesa de compraventa y compraventa de viviendas, así como las causas que autorizan su resolución por parte del comprador o del urbanizador. Así, el Reglamento Núm. 2268 y su enmienda mediante el Reglamento Núm. 8070 constituyen un desarrollo reglamentario legítimo de la política pública expresamente delineada por la Asamblea Legislativa para equilibrar la protección del consumidor con los derechos contractuales del urbanizador.

armonizar la protección al consumidor con el ejercicio legítimo de los derechos del urbanizador conforme a derecho.

Tanto el Reglamento 2268, *supra*, como su versión enmendada autorizan al urbanizador o constructor a resolver el contrato de compraventa o promesa de compraventa cuando el comprador incumple con obligaciones esenciales pactadas en el contrato, incluyendo el pago del pronto pago o de los depósitos acordados dentro del término establecido. En tales circunstancias, siempre que el incumplimiento no sea imputable a la parte vendedora ni medie caso fortuito o fuerza mayor, la reglamentación permite a la vendedora retener una porción de los pagos efectuados por el comprador, conforme a los parámetros reglamentarios aplicables, sin necesidad de probar daños, y obliga a la devolución del remanente en estricto cumplimiento con las disposiciones sobre cuentas especiales de depósito.

En cuanto al procedimiento para la resolución contractual, la Sección 17 del Reglamento 2268, *supra*, según vigente, dispone que la parte que decida resolver el contrato *"deberá notificar su decisión por correo certificado con acuse de recibo a la otra parte y expondrá la causa de dicha resolución",* permitiendo alternativamente la notificación personal con acuse firmado, y concediendo a la parte notificada un término de quince (15) días para manifestar su desacuerdo.

Finalmente, la Sección 19 del Reglamento 2268 *supra*, regula el manejo de los depósitos efectuados por el comprador con anterioridad al otorgamiento de la escritura de compraventa. Dicha disposición exige que los dineros recibidos por concepto de depósitos o pagos adelantados se mantengan en cuentas especiales de reserva o depósito (*escrow*) en instituciones financieras autorizadas a operar en Puerto Rico, hasta tanto proceda su acreditación al precio de compraventa o su devolución, según corresponda. Estas

salvaguardas reglamentarias buscan proteger los intereses económicos del consumidor, sin impedir que el urbanizador ejerza válidamente su derecho contractual y reglamentario a resolver el contrato cuando concurre un incumplimiento imputable al comprador.

### G. Honorarios por Temeridad

La Regla 44.1 de Procedimiento Civil de 2009, *supra*, faculta a los tribunales a imponer el pago de una cuantía por concepto de honorarios de abogado en casos donde cualquiera de las partes o sus abogados hayan procedido con temeridad o frivolidad. A falta de una definición de lo que constituye temeridad, el Tribunal Supremo de Puerto Rico ha dispuesto que "[l]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia". *Consejo Titulares v. MAPFRE*, 2024 TSPR 140, 215 DPR ___ (2025); *Jarra Corp. v. Axxis Corp.*, 155 DPR 764, 779 (2001).

La conducta que amerita la imposición de honorarios de abogado por temeridad es cualquiera que haga necesario un pleito que se pudo evitar o que ocasione gestiones evitables. *Asoc. Salud Primaria y otros v. ELA y otros*, 2025 TSPR 75, 216 DPR ___ (2025); *Martínez Maldonado v. CONSERVE,* 2024 TSPR 125, 215 DPR ___ (2024). De esta manera, en nuestro ordenamiento, los honorarios por temeridad se imponen como penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajos e inconveniencias de un pleito. *Asoc. Salud Primaria y otros v. ELA y otros*, supra; *SLG González-Figueroa v. SLG et al.,* 209 DPR 138, 148-149 (2022)*; Torres Montalvo v. Gobernador ELA,* 194 DPR 760, 778 (2016). De ahí que, como regla general, establecida la

concurrencia de tal conducta, la condena de honorarios resulta ser imperativa. *Martínez Maldonado v. CONSERVE,* supra.

Aunque la penalidad por temeridad de una parte no está explícitamente consignada en las Reglas de Procedimiento Civil, *supra,* es a través de la imposición de honorarios de abogado, que el Tribunal ejerce esta facultad. Algunas instancias en las cuales el Tribunal Supremo de Puerto Rico ha reconocido que una parte actúa de forma temeraria se constituyen cuando:

> (1) contesta la demanda y niega responsabilidad total pero posteriormente la acepta,
>
> (2) se defiende injustificadamente de la acción,
>
> (3) cree que la cantidad reclamada es exagerada y es la única razón que tiene para oponerse a las peticiones del demandante, y no admite su responsabilidad pudiendo limitar la controversia a la fijación de la cuantía a ser concedida,
> **(4) se arriesga a litigar un caso del que se desprende prima facie su responsabilidad, y**
>
> (5) niega un hecho que le consta es cierto a quien hace la alegación.

(Énfasis suplido). *SLG González-Figueroa v. SLG et al.*, supra, pág. 150; *C.O.R.P. v. S.P.U.*, 181 DPR 299, 342 (2011).

El juzgador tendrá que adjudicar el monto correspondiente al grado de temeridad desplegado por el actor, ello mediante el ejercicio de su sano juicio. Es por ello que, "la determinación de si se ha incurrido o no en temeridad es una tarea que recae en la discreción sana del tribunal sentenciador y solo se intervendrá con ella en casos en los que se desprenda el abuso de tal facultad". *Slim v. El Conquistador Resort*, 2025 TSPR 133, 216 DPR___ (2025); *Martínez Maldonado v. CONSERVE,* supra. Véase, además, *Consejo Titulares v. MAPFRE*, supra; *SLG González-Figueroa v. SLG et al.*, supra, pág. 150.

**III.**

En atención a la relación existente entre los *primeros dos (2) señalamientos de error,* procederemos a analizarlos de manera conjunta. Mercado Torres sostiene que el TPI-Bayamón erró al dictar sentencia sumaria sin celebrar conferencia de manejo ni estructurar el caso conforme a la Regla 37 de Procedimiento Civil, *supra,* alegando que se limitó su capacidad para sustanciar sus reclamaciones. De igual modo, argumenta que la adjudicación fue prematura por no haberse completado el descubrimiento de prueba que reputa indispensable, incluyendo evidencia relacionada con la notificación de terminación contractual, correspondencia entre las partes, el manejo del segundo depósito, la aplicación de los Reglamentos Núm. 2268 y 8070 del DACo y alegados aumentos en los precios del proyecto, lo que a su juicio vulneró su derecho al debido proceso de ley.

Del examen del expediente, surge que Biella presentó una moción de sentencia sumaria acompañada de evidencia documental que acreditaba los hechos esenciales del caso, entre estos, la existencia del *"Contrato Uniforme de Compraventa",* el esquema de pagos pactado, las comunicaciones relacionadas con el segundo pago y la notificación de terminación del contrato. *Dichos hechos no fueron controvertidos por Mercado Torres.*

Si bien el apelante alegó la necesidad de completar el descubrimiento de prueba y de seguir una secuencia procesal distinta, no identificó hechos materiales específicos que permanecieran en controversia ni demostró cómo la prueba adicional alegada tendría el efecto de alterar los hechos esenciales ya acreditados en el récord, máxime cuando la mera expectativa de descubrir prueba adicional no basta para derrotar una moción de sentencia sumaria debidamente sustentada. Sus planteamientos se limitaron a señalar la posible existencia de evidencia adicional, sin

controvertir de forma concreta los hechos materiales presentados por Biella.

Así, a la luz de los hechos acreditados, el TPI-Bayamón actuó conforme a derecho al concluir que no existían controversias materiales que requirieran un juicio plenario. No se evidencia que el foro de instancia haya vulnerado las Reglas de Procedimiento Civil ni que haya limitado indebidamente la capacidad de Mercado Torres para sustanciar sus reclamaciones, toda vez que Biella cumplió con las formalidades y presentó evidencia suficiente sobre los hechos incontrovertidos. En consecuencia, la decisión de adjudicar la controversia mediante sentencia sumaria no constituyó una actuación prematura ni una violación al debido proceso de ley.

Por consiguiente, no erró el Tribunal de Primera Instancia al acoger la moción de sentencia sumaria sin celebrar conferencia de manejo ni permitir la culminación del descubrimiento de prueba, pues los hechos materiales esenciales se encontraban debidamente sustentados y no controvertidos en el expediente.

En atención a la relación intrínseca existente entre *el tercer y el cuarto señalamiento de error*, procederemos a discutirlos de manera conjunta. En ambos, Mercado Torres sostiene, en esencia, que el foro de instancia erró al validar la terminación del contrato de compraventa sostenida por Biella y al descartar la naturaleza de adhesión del contrato, sin evaluar adecuadamente los requisitos reglamentarios aplicables ni las normas de interpretación que rigen este tipo de acuerdos.

Mercado Torres planteó que la terminación contractual avalada por el TPI-Bayamón se sostuvo sin examinar si la parte apelada cumplió con las exigencias impuestas por los Reglamentos Núm. 2268 y 8070 del DACo, particularmente en lo relativo al procedimiento de notificación y al manejo del segundo depósito. Asimismo, aduce que el contrato suscrito constituía un contrato de

adhesión, redactado unilateralmente por Biella, con cláusulas alegadamente incompatibles o inconsistentes con la normativa reglamentaria, lo que requería un análisis interpretativo más riguroso antes de validar su ejecución. *No le asiste la razón.*

En primer lugar, surge del expediente que la obligación principal cuyo incumplimiento se imputó al apelante —*el pago del segundo depósito dentro del término pactado*— constituía una obligación esencial claramente establecida en el contrato. Dicha obligación contaba con una fecha cierta para su cumplimiento, por lo que la mora se produjo automáticamente al vencimiento del término acordado, sin que fuese necesario un requerimiento previo.

Contrario a lo argumentado por Mercado Torres, el hecho de que la relación contractual esté regulada por normativa administrativa no priva de eficacia a las cláusulas contractuales claras que reproducen o armonizan con dichas disposiciones. Los Reglamentos Núm. 2268 y 8070 del DACo autorizan expresamente al urbanizador a resolver el contrato cuando el comprador incumple con obligaciones esenciales, como el pago de los depósitos pactados, siempre que se observe el procedimiento establecido. En este caso, la evidencia presentada confirma que Biella actuó conforme al marco contractual y reglamentario aplicable, sin que del récord surgiera controversia material que impidiera resolver el asunto por la vía sumaria.

En cuanto a la alegada falta de notificación válida, el TPI-Bayamón determinó que la notificación de terminación del contrato cursada el *20 de agosto de 2025* cumplía sustancialmente con el propósito del requisito reglamentario: informar al comprador la causa de la resolución y la decisión de dar por terminado el contrato. Mercado Torres no presentó evidencia concreta que demostrara que el alegado desconocimiento del acuse de recibo le impidió ejercer oportunamente los remedios disponibles, limitándose a

planteamientos especulativos insuficientes para generar una controversia material de hechos.

De igual modo, el foro primario actuó correctamente al rechazar la caracterización automática del contrato como uno de adhesión inválido o inejecutable. El mero hecho de que un contrato sea redactado mediante un formulario predispuesto o esté sujeto a reglamentación administrativa no lo convierte, por sí solo, en abusivo ni impide su ejecución. Para que proceda la aplicación de las normas especiales de interpretación contra la parte predisponente, es necesario identificar cláusulas ambiguas, oscuras o irrazonables. En este caso, Mercado Torres no demostró la existencia de contradicciones en las cláusulas 30, 31, 32 y 33 del contrato, ni su incompatibilidad con los Reglamentos 2268 y 8070 del DACo que requirieran interpretación adversa a la parte apelada.

Por el contrario, del texto contractual surge de forma clara y específica la obligación de pago, las consecuencias de su incumplimiento y la facultad de resolución contractual. Ante la ausencia de ambigüedad, el foro primario estaba obligado a hacer valer los términos del contrato conforme a su tenor literal, sin sustituir la voluntad legítimamente expresada por las partes ni reescribir el acuerdo.

Por todo lo anterior, concluimos que el TPI-Bayamón aplicó correctamente el derecho a los hechos incontrovertidos del caso al validar la terminación del contrato y al rechazar la alegación de adhesión contractual.

En su *quinto señalamiento de error,* el apelante sostiene que el foro de instancia erró al rechazar de plano los recursos posteriores a la sentencia y al negarse a considerar alegada evidencia nueva y pertinente, específicamente la supuesta ausencia de acuse de recibo en la carta de terminación, la conducta tolerante de Biella y los aumentos posteriores en los precios del proyecto. Argumenta,

además, que la denegatoria de la reconsideración el mismo día de su presentación, sin un análisis sustantivo, le impidió completar el récord y limitó su derecho a un examen pleno de las controversias materiales. *No le asiste la razón.*

Como norma general, los recursos de reconsideración no constituyen un mecanismo para reabrir el caso ni para introducir evidencia que pudo y debió presentarse oportunamente durante el trámite adjudicativo. Su propósito se limita a señalar errores manifiestos de derecho o de hecho, o a atender situaciones verdaderamente extraordinarias que justifiquen la alteración de una sentencia válida. En este caso, el apelante no demostró que la alegada evidencia fuera nueva en el sentido jurídico del término, ni que resultara imposible presentarla antes de dictarse la sentencia.

En cuanto a la supuesta ausencia de acuse de recibo en la carta de terminación, del récord surge que el TPI-Bayamón evaluó el cumplimiento sustancial con el procedimiento reglamentario aplicable y determinó que la notificación de la resolución contractual fue adecuada. El señalamiento posterior de Mercado Torres no introduce un hecho novedoso, sino una reiteración de un planteamiento que pudo haberse articulado durante el proceso principal y que no altera el fundamento de la determinación judicial.

De igual forma, la alegada conducta tolerante y de buena fe de Biella, y los alegados aumentos posteriores en los precios del proyecto no constituyen hechos determinantes para desvirtuar la conclusión del foro primario sobre el incumplimiento contractual imputable al apelante. Tales alegaciones, aun de aceptarse como ciertas, no tienen el efecto de modificar las obligaciones contractuales pactadas ni de neutralizar el derecho de Biella a resolver el contrato conforme a sus términos y a la reglamentación aplicable. Pretender lo contrario implicaría relevar a Mercado Torres de las consecuencias jurídicas de su propio incumplimiento.

Por otro lado, la mera circunstancia de que el TPI-Bayamón haya denegado la reconsideración el mismo día de su presentación no constituye, por sí sola, un error reversible. Nuestro ordenamiento no exige que el tribunal emita un extenso análisis escrito al rechazar un recurso de reconsideración, particularmente cuando del contenido del escrito surge que no se plantean argumentos nuevos ni se identifican errores sustanciales que ameriten la alteración de la sentencia.

En su *sexto y último señalamiento de error*, Mercado Torres alega que el TPI-Bayamón erró al imponerle temeridad, costas y honorarios de abogado sin identificar alegaciones falsas o frívolas ni fundamentar dicha determinación en hechos concretos del récord. Sostiene, además, que la sanción penalizó indebidamente una controversia sustantiva legítima relacionada con la terminación contractual, el cumplimiento del segundo pago y la aplicación de los Reglamentos Núm. 2268 y 8070 del DACo. *No le asiste la razón.*

Como es sabido, la imposición de honorarios de abogado por temeridad constituye una determinación discrecional del tribunal sentenciador, basada en la conducta procesal desplegada por las partes durante el curso del litigio. *Slim v. El Conquistador Resort, supra.* En ese contexto, el foro primario, por ostentar inmediatez sobre los trámites ventilados ante su consideración, se encuentra en una posición privilegiada para evaluar el alcance, las motivaciones y las consecuencias de la actuación de los litigantes.

Del expediente no surge prueba alguna que demuestre que, al imponer la sanción, el TPI-Bayamón haya transgredido los límites normativos que rigen el ejercicio de su discreción adjudicativa. Por el contrario, la determinación descansa en una evaluación razonable del trámite procesal y la insistencia de Mercado Torres en continuar litigando controversias que el foro de instancia entendió carentes de mérito suficiente.

En ausencia de un señalamiento concreto que evidencie abuso de discreción, este foro apelativo no está llamado a sustituir su criterio por el del juzgador de instancia. Así, al no desprenderse del récord que el foro primario haya actuado en contravención al estado de derecho vigente, y al estimar razonable su determinación, procede sostener la imposición de honorarios de abogado, costas y temeridad.

**IV.**

Por lo antes expuesto, *confirmamos* la *"Sentencia"* apelada, emitida el, por el Tribunal de Primera Instancia, Sala Superior de Bayamón.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones